AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| vs. | CASE NUMBER: 8:08-m- |
| KEVIN MASSIMINO,<br>ROBERT CADDICK, and<br>DONALD RIGGANS | 8:08MJ1110 TBM |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or about December, 2007 and continuing through on or about March 14, 2008, in Pasco and Hillsborough Counties, in the Middle District of Florida and eslewhere, the defendants did,

> conspire and agree with each other and other unknown persons to possess with intent to distribute hydrocodone, a Schedule II controlled substance,

in violation of Title 21, United States Code, Section 846. I further state that I am a(n) Special Agent with the Drug Enforcement Administration, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

_____
Signature of Complainant
Nicki Hollmann, Special Agent

Sworn to before me and subscribed in my presence,

March 14, 2008                              at         Tampa, Florida

Thomas B. McCoun, III
United States Magistrate Judge
Name & Title of Judicial Officer                      Signature of Judicial Officer

N:\_Criminal Cases\M\Massimino, Kevin_2008R00013_aep\f_complaint.wpd

## AFFIDAVIT

Your Affiant being duly sworn, does depose and state the following:

1. Your Affiant, Nicki Hollmann, has been employed as a Special Agent of the United States Drug Enforcement Administration ("DEA") for seventeen years. Your affiant is currently assigned as a Group Supervisor over a DEA enforcement group in Tampa, Florida.

2. The information contained in this affidavit is based on my training, experience and my personal knowledge and observations during the course of this investigation, and information provided to me by other sources as noted herein.

3. The information contained in this affidavit does not contain all the facts known to your affiant regarding the instant investigation, rather the affidavit only contains facts your affiant submits as sufficient to establish probable cause.

4. Hence, this affidavit is submitted in support of a complaint alleging violations of Title 21, United States Code, Section 846 against Kevin Massimino, Robert Caddick, and Donald Riggans.

## INVESTIGATIVE FINDINGS

5. In or around late 2005, a confidential source ("CS1") was introduced to Kevin MASSIMINO by a mutual acquaintance. CS1 soon became aware Kevin MASSIMINO was involved in the illegal distribution of pharmaceutical drugs, to include hydrocodone (Schedule II), Vicadin (Schedule III) and Xanax (Schedule III). Soon after the initial introduction, CS1 began purchasing Xanax and hydrocodone from Kevin MASSIMINO

for re-distribution. From late 2005 until late 2007, CS1 purchased from Kevin MASSIMINO in excess of 100,000 pills.

6. Kevin MASSIMINO often spoke to CS1 about his source of supply, referring to "The Fat Man," or "Fat Bob," later identified as Robert "Bob" CADDICK. Kevin MASSIMINO told CS1 that his source of supply was the Chief Financial Officer for MEDIPHARM PHARMACY, a DEA registered pharmaceutical supply company. Records confirm that Robert "Bob" CADDICK was affiliated with MEDIPHARM PHARMACY. Kevin MASSIMINO told CS1 that his source of supply steals hydrocodone and other pharmaceutical tablets from MEDIPHARM and "cooks the books" (alters records) to conceal the loss/shortage and then sells the tablets to Kevin MASSIMINO.

7. CS1 described to law enforcement incidents where he/she was present when Kevin MASSIMINO received pharmaceutical tablets from Robert CADDICK. Specifically, in or around September or October 2006, CS1 accompanied Kevin MASSIMINO to a Dunkin Donuts restaurant on Hillsborough Avenue, Tampa, Florida. Upon arrival Robert CADDICK was waiting in the parking lot. Kevin MASSIMINO and Robert CADDICK met in the business while CS1 waited in Kevin MASSIMINO'S vehicle. Kevin MASSIMINO returned explaining Robert CADDICK was to supply Kevin MASSIMINO with 35,000 tablets of hydrocodone and 5000 tablets of Xanax. On the following day, at the direction of Kevin MASSIMINO, CS1 drove to the Wal-Mart, located on Dale Mabry Highway, Tampa, Florida. CS1 observed Robert CADDICK sitting inside a blue/silver Mercedes. Approximately 5 minutes later, Kevin MASSIMINO arrived in the parking lot and called CS1. Kevin MASSIMINO directed CS1 to retrieve

the pharmaceutical tablets from Robert CADDICK'S vehicle once he and Robert CADDICK walked inside the Wal-Mart. Kevin MASSIMINO told CS1 that Robert CADDICK would intentionally leave the vehicle unlocked. CS1 retrieved the pills as directed and drove them directly to his/her residence for safekeeping. Kevin MASSIMINO arrived at CS1's residence 20-30 minutes later and assisted in removing the labels from the tablet containers. Kevin MASSIMINO left the residence with 10,000 tablets to deliver to a customer at the Seminole Hard Rock Hotel and Casino, located at: 5223 Orient Road, Tampa, Florida 33610, referred herein as the Hard Rock Casino, Tampa, Florida. CS1 was paid $4,000 for storing the remaining tablets for approximately one week. Kevin MASSIMINO picked up tablets as needed for distribution and on occasion would have CS1 make deliveries to different customers in the Tampa, Florida area.

8. In late 2006, Kevin MASSIMINO discussed with CS1 a plan to steal hydrocodone from the pharmacy associated with Robert CADDICK. According to CS1, Robert CADDICK was to assist in the theft of the hydrocodone from the pharmacy. Although Kevin MASSIMINO discussed details on how he would commit the theft, CS1 was unaware if the plan was followed through.

9. In December 2007, Kevin MASSIMINO approached a second confidential source ("CS2") asking for assistance in stealing 100,000 tablets of hydrocodone from a pharmacy warehouse. Kevin MASSIMINO told CS2 he had an associate inside the pharmacy named "Bob", who would assist by providing Kevin MASSIMINO access to the warehouse after hours. Kevin MASSIMINO also related that "Bob" assured him

that no one else would be in the warehouse at the time of the theft. Kevin MASSIMINO told CS2 he was going to pay "Bob" for his assistance.

10. Previously, in approximately August, 2007, CS2 was asked by Kevin MASSIMINO to assist him in collecting gambling debts owed to him. Between August and December 2007, CS2 collected money for Kevin MASSIMINO on 3 occasions. Specifically, CS2 collected $2,000, and $8,000 in United States currency, and a personal check in the amount of $19,000. Each time CS2 delivered the funds to Kevin MASSIMINO. During a meeting, Kevin MASSIMINO discussed with CS2 a gambling debt owed to Kevin MASSIMINO by an un-named individual. Kevin MASSIMINO asked CS2 to assist him by collecting the money owed, and provided CS2 with a computer printout from the State of Florida Department of Highway Safety and Motor Vehicles/ Driver and Vehicle Information Database ("DHSMV/DAVID"). The printout displayed a photographic image and detailed driver license information for the un-named individual.

11. In December 2007, CS2 met with Kevin MASSIMINO and a subject named "Don", later identified as Donald RIGGANS, a Deputy Sheriff with the Pasco County Sheriff's Office. During the investigation, Kevin MASSIMINO inferred that Donald RIGGANS and another un-named Pasco County Sheriff's Deputy, later identified as a detention deputy ("un-named detention deputy") would at times assist Kevin MASSIMINO with illegal activities. During the meeting, CS2 observed Kevin MASSIMINO provide Donald RIGGANS with $2,000 United States currency.

12. During the months of December, 2007 and January, 2008, Kevin MASSIMINO discussed with CS2 a variety of details of the plan to steal hydrocodone from the pharmacy associated with Robert CADDICK, to include obtaining a police scanner so

that police radio traffic could be monitored during the theft. Later, discussions were held regarding the use of a Pasco County Police Radio for the same purpose. Neither the scanner or police radio were obtained for that purpose.

13. On January 17, 2008, Kevin MASSIMINO introduced CS2 to Robert CADDICK. After the three met, Kevin MASSIMINO and CS2 left the meeting together. Kevin MASSIMINO discussed how CADDICK can make the tablets cheaper and at various sizes and strength. CS2 tells Kevin MASSIMINO his/her customer in Miami will pay $3.25 for every tablet he can get. Kevin MASSIMINO and CS2 discuss the strength of the tablets supplied by Robert CADDICK. At the end of the conversation, CS2 asked Kevin MASSIMINO what they were going to do. Kevin MASSIMINO replied: "Make some money Bro!"

14. On February 7, 2008, CS2 met with Kevin MASSIMINO at the Westshore Mall in Tampa, Florida to discuss receiving hydrocodone. CS2 told Kevin MASSIMINO that CS2 had a prospective buyer for hydrocodone located in Miami, Florida. Kevin MASSIMINO attempted to contact Robert CADDICK in an effort to obtain a sample of the hydrocodone for CS2 to show his prospective buyer. According to Kevin MASSIMINO, Robert CADDICK was in the process of manufacturing hydrocodone. Kevin MASSIMINO told CS2 Robert CADDICK had completed the manufacturing of 25,000 dosage units (DUS), and that when Robert CADDICK finished 50,000 DUS Kevin MASSIMINO wanted CS2 to pick up the tablets and store them for safe keeping until delivered to Kevin MASSIMINO'S customers. Kevin MASSIMINO told CS2 he would provide a 6,500 tablet sample of hydrocodone by next Saturday, February 16th for CS2's customer in Miami.

15.    On February 13, 2008, CS2 met with Kevin MASSIMINO and the un-named detention deputy at a Bally's Gym in Tampa, Florida to workout. Upon leaving the gym CS2 proposed a pre-conceived scheme (directed by law enforcement) that could make them a lot of money. CS2 asked Kevin MASSIMINO and the un-named detention deputy if they wanted to hear the scheme at which time the un-named detention deputy asked CS2 if it was "shady." CS2 stated it was shady, and that they all could make good money. CS2 further explained that a courier working for his drug customer in Miami was to drive to Tampa with money to purchase the Hydrocodone. CS2 told Kevin MASSIMINO and the un-named detention deputy that he/she could arrange for the courier to carry $30, 000 for the ordered drugs, and could provide information on where the courier was and/or which hotel he was staying. Once located, the un-named deputy and/or Donald RIGGANS could make a traffic stop in a Police vehicle, take the money as seized funds and let the courier go. CS2 continued, stating he/she would contact his drug customer in Miami to complain on not receiving the money, forcing the drug customer to pay twice. The un-named detention deputy told CS2: "He'll have to be in Pasco County though". CS2 explained he/she could arrange to have the courier drive anywhere they wanted. The un-named detention deputy told CS2 it sounded good. Kevin MASSIMINO also gave his approval. Kevin MASSIMINO and the un-named detention deputy told CS2 that they thought it was a good idea but they would have to think about it. Kevin MASSIMINO told CS2 they would meet the following day. The un-named detention deputy made a comment about Donald RIGGANS stating they would need Donald RIGGANS because he has a patrol car. The un-named detention

deputy told CS2 they would have to see what they could put together but that he needed to speak with Donald RIGGANS first.

16.     On February 15, 2008, CS2 met with Kevin MASSIMINO and the un-named detention deputy at the International Mall, Tampa, Florida to discuss details of the proposed traffic stop to rip off CS2's drug customer.  The un-named detention deputy stated again that he did not have a patrol car that could be used for the stop, and suggested to use Donald RIGGANS for the traffic stop and theft.

17.     On February 18, 2008, CS2 met with Kevin MASSIMINO at the Alltel Cellular Phone store on Kennedy Blvd at Westshore Blvd, and then drove to the Hard Rock Casino in Tampa, Florida.  Kevin MASSIMINO asked CS2 if he/she was going down (to Miami) that night.  CS2 told Kevin MASSIMINO he/she needed to speak with Donald RIGGANS first in order to get the plan straight.  Kevin MASSIMINO asked CS2 if he/she wanted to take some of his hydrocodone to Miami.  CS2 explained he/she would like to provide a good representative sample as good faith.

18.     Further, on February 18, 2008, CS2 and Kevin MASSIMINO discussed the planned traffic stop with Donald RIGGANS and the seizure/theft of currency being carried by a courier who expected to pick up hydrocodone.  CS2 explained they needed to have the drugs available in the event Donald RIGGANS backed out.  Kevin MASSIMINO quickly replied stating "No, no, no, He's not going to back out, I'm giving you my word." CS2 told Kevin MASSIMINO they needed to square things with Donald RIGGANS concerning the location of the traffic stop.  Kevin MASSIMINO stated he would talk with Donald RIGGANS and that he was definitely in.

19.     On February 18, 2008, Kevin MASSIMINO made arrangements for CS2 to meet with Robert CADDICK to obtain hydrocodone and Xanax for CS2 to take to Miami and present as a sample of the quality available by CS2 and Kevin MASSIMINO. CS2 traveled to the Hooters Restaurant located at 3400 Hwy 98 North, Lakeland, Florida, to meet with Robert CADDICK. Robert CADDICK arrived and entered the Hooters Restaurant with CS2. Inside the Hooters Restaurant, CS2 told Robert CADDICK the he/she had people in Miami who would purchase all the pharmaceuticals that can be supplied and that he/she has been trying to put a deal together for the past five (5) months. Robert CADDICK told CS2 that he is probably what Kevin MASSIMINO had him working on. Robert CADDICK explained how he supplied Kevin MASSIMINO with pharmaceuticals. Robert CADDICK further explained his access to certain pharmaceuticals and ability to have certain pharmaceuticals manufactured from raw material in bulk. Robert CADDICK asked CS2 how much of a sample he/she needed. CS2 mentioned 100 to 1000, with Robert CADDICK responded affirmatively. Robert CADDICK told CS2 that Kevin MASSIMINO owed him between $15,000 and $20,000, and that he had done three (3) shipments in the last three (3) months with Kevin MASSIMINO. After their meeting inside the Hooters Restaurant, CS2 and Robert CADDICK went outside where CADDICK provided CS2 1,200 hydrocodone pills, and 1,000 Xanax pills to be utilized as a sample to provide to CS2's Miami buyer.

20.     Later, on the same date of February 18, 2008, CS2 met with Kevin MASSIMINO at the Bally's Gym in Tampa, Florida. During their meeting, Kevin MASSIMINO called Donald RIGGANS. Kevin MASSIMINO instructed CS2 to meet with Donald RIGGANS

off Little Road in Pasco County, which, according to Kevin MASSIMINO was close to where Donald RIGGANS lived.

21.     At approximately 4:30pm, on February 18th, CS2 arrived at the Publix shopping center, located at 5324 Little Road, New Port Richey, Florida, to meet with Donald RIGGANS. Kevin MASSIMINO called CS2 several times to advise that Donald RIGGANS would be driving a green Saturn, traveling with his wife and children. Kevin MASSIMINO told CS2 he was to meet Donald RIGGANS in the men's restroom. At approximately 4:50pm Donald RIGGANS arrived and subsequently met with CS2 in the men's room. They exchanged greetings and Donald RIGGANS searched CS2 for a recording device. Donald RIGGANS spoke in soft tones, discussing his work schedule, off duty details and briefly mentioned a narcotics case where a large sum of money was involved. CS2 told Donald RIGGANS all he/she needed was to know which day, either Wednesday or Thursday and what time and place he wanted the courier to drive to. CS2 told Donald RIGGANS the driver would only be a runner carrying $30,000, no guns, just cash. Donald RIGGANS responded: "Just cash?" CS2 told Donald RIGGANS that if he wanted to throw a bag of cocaine on the courier, as discussed in a previous meeting, to justify the search, it was up to him. CS2 assured Donald RIGGANS the driver was going to give up the money and would not be a problem. Donald RIGGANS told CS2 he would have to see what day would be best, either Wednesday or Thursday. Donald RIGGANS stated he would check and get back with CS2. CS2 told Donald RIGGANS that Kevin MASSIMINO would provide him with his/her number to the pre-paid phone.

22.     On February 20, 2008, Kevin MASSIMINO placed a three way call between he, CS2 and Donald RIGGANS. CS2 stated they needed to discuss the time and location for the courier to meet in Pasco County. CS2 advised Donald RIGGANS he/she told the Miami customer the tablets had to be picked up in Pasco County but a time and location was needed. Donald RIGGANS stated the stop had to occur in the evening. CS2 told Donald RIGGANS he/she would have the make/model, color of vehicle and the driver's name and that he/she will be in real time contact with him (Donald RIGGANS) up to the time the stop was made. Donald RIGGANS stated the stop had to be around 11:00pm or 11:30pm and not much later. CS2 told Donald RIGGANS it would be no problem. As Donald RIGGANS told CS2 he would determine a location for the stop, a police radio could be heard in the background, indicating Donald RIGGANS was on duty.

23.     On February 28, 2008, Kevin MASSIMINO, Donald RIGGANS, and CS2 met and discussed details of their proposed plan. During the meeting, CS2 and Kevin MASSIMINO specifically advised Donald RIGGANS that CS2 had provided a sample of 1,200 hydrocodone pills to the buyer in Miami. Donald RIGGANS commented that the pills that CS2 provided were the "teaser". Donald RIGGANS questioned CS2 about CS2's relationship with the Miami pill customers/courier. Donald RIGGANS advised that he wanted to conduct the plan in a way that will cause him not to get fired from the Pasco County Sheriff's Office. Donald RIGGANS was concerned that the Miami courier might call the Pasco County Sheriff's Office and complain, which could lead to him being put under investigation, and subject him to taking a polygraph. Donald RIGGANS further discussed how he would call out his traffic stop. Donald RIGGANS

told CS2 that a good place to conduct the operation was the Winn-Dixie on Moon Lake in Pasco County and provided detailed directions. CS2 explained that he wanted to maintain his relationship with the Miami customer, because on Saturday he/she and Kevin MASSIMINO were planning to acquire additional pills for distribution to the Miami customer. Donald RIGGANS and CS2 discuss their individual financial problems and how Donald RIGGANS would justify the monies. Donald RIGGANS and CS2 discussed how the proceeds would be split, and Donald RIGGANS agreed that he was comfortable with the dollar amount that would be divided between Donald RIGGANS, CS2 and Kevin MASSIMINO. CS2 inquired if Donald RIGGANS could run people for CS2 and Donald RIGGANS explained that he has done that favor for Kevin MASSIMINO on several occasions. Donald RIGGANS and CS2 agreed to speak later.

24.    On March 10, 2008, Kevin MASSIMINO, Donald RIGGANS, and CS2 agreed to have the "Miami buyer" send his courier to Pasco County on March 11, 2008. Kevin MASSIMINO, Donald RIGGANS, and CS2 agreed to provide five (5) Hydrocodone pills to the courier as a sample to entice the courier to turn over the buy money. They further agreed that once the courier turned over the money to CS2 and Kevin MASSIMINO, Donald RIGGANS would then execute a "ruse" and pretend to conduct a traffic stop on CS2 and Kevin MASSIMINO, thereby intimidating the Miami courier and causing the courier to flee the scene.

25.    On March 11, 2008, Kevin MASSIMINO and CS2 occupied CS2's vehicle. They

traveled in the vehicle to their pre-arranged meet place located at a Winn-Dixie parking lot in Pasco County. While enroute to the Winn-Dixie parking lot, CS2 and Kevin MASSIMINO had numerous telephone conversations with Donald RIGGANS to comfirm logistics of locations and the planned traffic stop. During one conversation with Donald RIGGANS, CS2 advised that he was going to provide the Miami courier with five (5) hydrocodone pills as a sample in order to convince the Miami courier to turn over the United States currency before the bulk pills would be presented. CS2 further advised Donald RIGGANS that it was imperative that the Miami courier not be stopped in possession of the pills and that the Miami courier be allowed to leave the area. Kevin MASSIMINO had provided the five (5) hydrocodone pills to CS2 earlier in that day. A third confidential source ("CS3"), acting as the Miami courier, subsequently arrived at the Winn-Dixie parking lot. CS2 exited his vehicle and provided the five (5) hydrocodone pills to CS3 as a sample to entice CS3 to turn over the buy money. CS3 in turn provided CS2 the buy money. CS2 then took the buy money back into his/her vehicle and provided it to Kevin MASSIMINO. As planned, Donald RIGGANS, uniformed as a Pasco County Sheriff's Deputy, in his Pasco County Sheriff's Office patrol car executed a stop of CS2's vehicle by flashing his police lights. RIGGANS then acted as if he was investigating CS2 and Kevin MASSIMINO, at which time CS3 drove away from the scene with the five (5) hydrocodone pills. After CS3 left the Winn-Dixie parking lot, Donald RIGGANS instructed CS2 and Kevin MASSIMINO to another meet location so that they could split up the proceeds. During the conversation CS2 and Kevin MASSIMINO explained to Donald RIGGANS that the United States currency was less than the expected $50,000. CS2 further explained that the Miami courier only

wanted 7000 pills and not the previous agreed upon amount, making the United States currency in the possession of CS2 and Kevin MASSIMINO less.

26.   Kevin MASSIMINO, Donald RIGGANS, and CS2 then met at a school located near Donald RIGGANS' house to split up the $25,000 they obtained from CS3. It should be noted that the $25,000 was serialized official government funds. The agreement was for Donald RIGGANS to obtain $10,000, CS2 to obtain $10,000, and Kevin MASSIMINO to obtain $5,000. However, Kevin MASSIMINO took an additional approximate $1,000 of RIGGANS' share. Thus, Kevin MASSIMINO obtained approximately $6,000 and RIGGANS obtained approximately $9,000.

This completes my affidavit.

NICKI HOLLMAN, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this 14th day of March, 2008.

THOMAS B. McCOUN, III
United States Magistrate Judge